IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

CLACKAMAS COUNTY ASSESSOR,   )
 )
      Plaintiff,   )   TC-MD 120298D
 )
  v.   )
 )
KEVIN GEARY,   )
 )
      Defendant.   )   **DECISION**

Plaintiff appeals the 2011-12 real market value of property identified as Account

05003823 (subject property). A telephone trial (uncontested) was held on July 26, 2012. Todd

Cooper (Cooper), Registered Appraiser, appeared and testified on behalf of Plaintiff.

Plaintiff's Exhibits 1 through 7 were admitted without objection.

## I. STATEMENT OF FACTS

The subject property is a farmhouse style single family home that sits on 1.47 acres of

land in Northeast Clackamas County. (Ptf's Ex 1 at 4.) The home is 3,832 square feet with two

stories, six bedrooms, and two bathrooms. (*Id.*) The home "was originally constructed around

the turn of the century and has had several subsequent additions and remodels. The most recent

addition was a 960 square foot area added in 2005." (*Id.*) Cooper testified that the subject

property has good access to highway and freeway systems, shopping centers, employment

centers, and recreational centers.

Cooper testified that on December 6, 2000, approximately 300 gallons of heating oil were

mistakenly pumped into the subject property's basement through an abandoned fill pipe that had

once been connected to a heating oil storage tank. (Ptf's Ex 6 at 3.) Cooper testified that the

Department of Environmental Quality (DEQ) report stated that the oil spill contaminated the soil

below and around the subject property's basement floor. (*Id.*) Cooper testified that DEQ approved contractor Foss Environmental performed a "phase I investigation" and "phase II mitigation and clean-up" of the subject property. (Ptf's Ex 1at 17.) Foss Environmental completed Phase I on March 16, 2001, and Phase II on May 16, 2001. (Ptf's Ex 6 at 3.) Cooper testified that Foss Environmental's "Remedial Investigation Report" dated July 2001, identified "no impacts to nearby domestic well" and "no residual risk from heating oil constituents using a risk-based analysis." (*Id.*) After inspecting the subject property on June 11, 2002, "DEQ determined that no further remedial action was required." (*Id.*)

Plaintiff appeals the Board of Property Tax Appeals (BOPTA) Order, dated March 13, 2012, determining a real market value of $100,000. (Ptf's Compl at 2.) According to the BOPTA Order, the subject property's maximum assessed value is $313,163. (*Id.*) Cooper testified that Plaintiff is requesting a real market value of $367,189 as of January 1, 2011.

Cooper testified that during the BOPTA hearing on February 6, 2012, the owner of the subject property testified that the subject property was stigmatized from the contamination that occurred in December 2000. Cooper testified that the owner of the subject property did not provide BOPTA with any evidence indicating that the property suffered from a long term stigma. Cooper testified that as a result of the BOPTA hearing, BOPTA reduced the real market value of the subject property from $367,189 to $100,000. (Ptf's Compl at 2.)

Cooper testified that he performed market research "to determine if a negative adjustment was appropriate due to [the] prior contamination." (Ptf's Ex 1 at 17.) Cooper testified that he began his research with 30 previously contaminated properties, and then narrowed the sample to the six properties most comparable to the subject property based on type and degree of contamination. Cooper testified that he compared the six properties' sale prices with their real

market values assigned by the county. Cooper testified that he found that all of the previously contaminated properties sold for prices higher than the county's real market tax roll values. (*See* Ptf's Ex 7 at 1.) Cooper testified that his "research indicated that once the contamination is properly remediated (and certified by D.E.Q.) and given adequate seasoning time of 12-36 months with no further reported contamination, similarly contaminated properties have sold at or very near market values and with marketing times typical of non-contaminated properties." (Ptf's Ex 1 at 17.) Cooper testified that his research found no long term stigma attached to previously contaminated properties that are comparable to the subject property.

Cooper testified that he considered the three valuation approaches in determining the subject property's 2011-12 real market value. (Ptf's Ex 1 at 11.) Cooper testified that "[t]he income approach was considered, but [was] not felt to be a credible indicator of market value as homes in the subject area are generally acquired for owner occupied, single family use rather than as income producing properties." (*Id.*)

Cooper testified that "[t]he cost approach indicates a value for the subject property of $367,189 as of 01/01/2011." (Ptf's Ex 1 at 11.) Cooper testified that "[t]he cost approach is the basis for the original valuation of the subject property for tax assessment purposes for January 1, 2011 * * *." (*Id.* at 17.) Cooper testified that the county's original valuation of the subject property supports a real market value of $367,189. (Ptf's Compl at 2.) Cooper testified that he included the $367,189 as the cost approach value in his appraisal report, but did not perform a new cost approach valuation. Cooper testified that the cost "valuation approach is typically more reliable with newly constructed homes * * * therefore the cost approach was given less weight in the final reconciliation." (Ptf's Ex 1 at 11.)

/ / /

Cooper testified that the sales comparison approach "supports a final estimate of value for the subject property of $415,000 as of 01/01/2011." (Ptf's Ex 1 at 11.) Plaintiff submitted the sale prices for five comparable properties as evidence of the subject property's real market value.[1] (Ptf's Ex 1 at 5.) The sale prices range from $317,500 to $465,000. (*Id.*) Cooper testified that he adjusted each comparable property's sale price to accurately reflect the conditions of the subject property. The sale prices of Comparable # 2, # 3, # 4, and # 5 were increased $81,300 (22.2 percent), $27,800 (7.5 percent), $32,540 (8.6 percent), and $76,040 (23.9 percent) respectively. (*Id.*) The sale price of Comparable # 1 was decreased $24,500 (5.3%). (*Id.*) The adjusted sale prices range from $393,540 to $447,800. (*Id.*)

The subject property is "located in an area that experienced a decline in property values for the twelve months prior to the effective date of appraisal." (Ptf's Ex 1 at 15-16.) Cooper made adjustments "based upon the estimated rate of decline of 8.0% over the prior twelve months." (*Id.* at 16.) Adjustments for differences in above grade finished living area and differences in garage area were made at the rates of $40.00 per square foot and $10.00 per square foot respectively. (*Id.*) Cooper increased the sale price of Comparable # 1 by $2,500, because the property lacked central air conditioning. (*Id.*) Cooper decreased the sale prices of Comparables # 1 and # 4 by $35,000 each, because the properties were remodeled and in better condition than the subject property. (*Id.*) Cooper decreased the sale price of Comparable # 3 by $15,000, because the property "included a small finished guest quarters area at the time of sale." (Ptf's Ex 1 at 17.) Cooper did not make adjustments for lot size and age differences. (*Id.* at 16.) Cooper explained that "the subject and comparable [lots were] felt to be functionally equal," and "[t]he subject and comparable sales [were] felt to be of similar overall effective age * * *." (*Id.*)

---

[1] Plaintiff did not include any of the six previously contaminated properties as one of the five comparable properties analyzed to determine the subject property's real market value.

Cooper testified that "[t]he sales comparison approach is the primary approach to value and was given the most consideration as it best represents the actions of buyers and sellers of similar properties in the current marketplace." (*Id*. at 11.) Cooper testified that Comparables # 1, # 3, and # 4 were "felt to be the best indicators of market value as they [had] the lowest overall net adjustments. These comparables were given more weight when arriving at the estimated value by the sales comparison approach." (*Id.* at 17.)

## II. ANALYSIS

At issue in this case is the subject property's real market value for tax year 2011-12. Real market value is defined in ORS 308.205 as:

> "[T]he amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."[2]

The assessment date for the 2011-12 tax year was January 1, 2011. ORS 308.007(2). The legislature requires real market value to be determined in all cases by "methods and procedures in accordance with rules adopted by the Department of Revenue." ORS 308.205(2). There are three methods of valuation that are used to determine real market value: (1) the cost approach, (2) the sales-comparison or comparable sales approach, and (3) the income approach. *Allen v. Dept. of Rev.,* 17 OTR 248, 252 (2003). *See also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property).

Because the subject property is a residence and not an income producing property, the income approach is inapplicable. Plaintiff included a value of $367,189 for the cost approach; however, Plaintiff did not perform a cost approach valuation. Plaintiff gave the comparable sales

[2] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

approach "the most consideration as it best represents the actions of buyer and sellers of similar properties in the current marketplace." (Ptf's Ex 1 at 11.)

OAR 150-308.205-(A)(2)(c), states that, "[i]n utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

As the party seeking affirmative relief, Plaintiff bears the burden of proving that the subject property's real market value is incorrect on the tax roll. ORS 305.427. Plaintiff must establish its claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.,* TC No 4530 at 4 (July 12, 2001) (citing *Feves v. Dept. of Revenue,* 4 OTR 302 (1971)). Plaintiff must also provide competent evidence of the real market value of the property. *Woods v. Dept. of Rev.,* 16 OTR 56, 59 (2002) (citing *King v. Dept. of Rev.,* 12 OTR 491 (1993)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor,* TC-MD No 110300D, WL 879285 (March 13, 2012). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.,*310 Or 260, 265, 798 P2d 235 (1990).

When evaluating the evidence, "the court looks to the comparability of the different sales and the application of all necessary adjustments for differences. Adjustments are a key component in evaluating properties." *Voronaeff v. Crook County Assessor,* TC-MD No 110361C, WL 1426847 at [*]3 (April 25, 2012).

/ / /

In the case before the court, Plaintiff submitted an appraisal report using five comparable properties to estimate the subject property's real market value. Plaintiff adjusted the five comparable properties to account for differences in size, quality, and other distinguishing features. (Ptf's Ex 1 at 5.) Plaintiff relied most heavily on Comparables # 1, # 3, and # 4 when calculating the subject property's market value, because those properties required the least amount of adjustments. (*Id*. at 17.) Plaintiff's appraisal report supports a value of $415,000 for the subject property. (*Id*. at 11.)

Plaintiff alleges that the subject property does not suffer from a long term stigma because of the contamination that occurred in December 2000; thus, the subject property's real market value should not be adjusted to account for the prior contamination. Plaintiff provided evidence that six previously contaminated properties sold at or above their county determined real market values once they had been properly remediated and given "adequate seasoning time" 12 to 36 months without any report of contamination. (Ptf's Ex 1 at 17.) Plaintiff provided evidence that the subject property was properly remediated as of 2001. (Ptf's Ex 6 at 3.)

Even though Plaintiff relied heavily on the comparable sales approach, which supported a value of $415,000, and provided evidence that an adjustment for prior contamination was not necessary, Plaintiff requests that the court determine a real market value of no more than $367,189. Plaintiff's requested real market value is the value the county originally determined for the subject property as of January 1, 2011.

Because Plaintiff submitted a complete comparable sales valuation that supports a value of $415,000, Plaintiff met its burden of proof. The court grants Plaintiff's request that the real market value of the subject property be $367,189.

/ / /

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that the subject property's real market value for the 2011-12 tax year is $367,189. Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2011-12 real market value of property identified as Account 05003823 is $367,189.

Dated this ＿＿ day of September 2012.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on September 21, 2012. The Court filed and entered this document on September 21, 2012.*